MARY EDDY. The (MORDECAI v.). See Case No. 9,790.

## Case No. 9,206.

### The MARY ELIZABETH.

[3 Sawy. 491.][1]

District Court, D. California. Oct. 8, 1875.

SEAMEN—WAGES—CONDITIONAL SALE.

Where the owner of a vessel agreed to sell her to two purchasers for a certain sum, to be

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

paid for in monthly installments, and gave immediate possession to the vendees; and it was further agreed that in case of default in the payments, the vessel should be returned to the owner, and the contract of sale rescinded; and the proposed purchasers were in that case to pay $125 per month for her use, while in their possession, deducting all sums paid on account of the purchase money, and default was made in the payment stipulated; but before the owner resumed possession under the contract, the libellant sold out his interest to his partner and was immediately employed by the latter to serve as pilot and mate: *held*, that the libellant had no lien on the vessel in the hands of a subsequent vendee of the owner.

In admiralty.

Daniel T. Sullivan, for libellant.

Charles Page, for claimants.

HOFFMAN, District Judge. The libellant in this case has proved that he served on board the above barge as pilot and mate from July 8 until August 28, 1874, at the rate of one hundred dollars per month, as agreed on between himself and Captain Bradbury, her acting master.

The defense relies on the following facts: On the fifth day of January, 1874, the Sacramento Wood Company, the owner of the barge, entered into a contract with the libellant and Captain Bradbury, by which they agreed to sell her for the sum of eight hundred dollars, to be paid for in monthly installments. Captain Bradbury and the libellant, on their part, agreed to purchase and pay for the barge as stipulated in the contract.

It was further agreed that should default be made in any of the payments, the barge was to be immediately returned to the possession of the company, the obligation on its part to convey title to her should cease, and the proposed purchasers were to be charged, and they agreed to pay, rent at the rate of one hundred and twenty-five dollars per month for the time she might have been in their possession, but credit was to be allowed on such rent for all sums paid on account of the purchase-money. It was also agreed that if the barge were lost before the full payment of the purchase, the loss should fall on the purchasers, and they should remain liable for the purchase-money.

Under this agreement Bradbury and the libellant took possession of the barge, and employed her in connection with the steamer Alvarado, with the owners of which they had made a somewhat similar contract. They failed, however, to make the stipulated payments to the company, but the possession was not demanded by, nor surrendered to, the company, nor were any steps taken to assert the rights of the latter until August 27, when the barge was sold to one Carroll, to whose vendees it was delivered by Captain Hutchins, who had bought out Bradbury's interest in the original contract.

On the eighth of the previous July, after the default in the payments had occurred, and while the barge still remained in the possession of Kates (the libellant) and Bradbury, Kates sold out his interest in the contract to Bradbury, and was immediately employed by the latter to serve as pilot and mate. He now claims that his demand for wages constitutes a lien on the barge in the hands of purchasers who derive title from the wood company.

But this claim cannot, in my opinion, be maintained. It is obvious that if the lien exists against the vessel in the hands of her present owners it would equally have existed against her if she were still owned by the wood company—and this whether the vendees of the company had or had not notice of Kates' claim. The lien was created, if at all, by his service on board the vessel, and not by the fact that the vendees of the company knew of his services. A lien may sometimes be lost by a transfer to a purchaser for value and without notice, but it cannot be created by the fact of such notice if it otherwise had no existence. If the vessel was free from the lien when the company resumed possession, the protection of its rights demands that it should be able to convey an unincumbered title to purchasers. If a mere notice of Kates' claim to a party proposing to purchase would subject the vessel in his hands to the lien, the effect would be the same as if she were subject to the lien in the hands of the company, her value in its hands would be diminished to the amount of the lien. But the point is too clear to need argument.

Could then the libellant, in the relation in which he stood to the owners of the vessel, acquire a lien upon her by virtue of services rendered in the employment of his associate after an assignment to the latter of his interest under the contract? It cannot, I think, be pretended that before that assignment either Kates or Bradbury could have acquired any lien for their services on board the vessel. They were not employed by the owners, and were rendering no services to them. They were on board a vessel of which they were the provisional owners. They had agreed to pay for her, and were put into possession to run her on their own account, and at their own risk. If she should be lost, the loss was to fall on them. In case of default in the payment of the purchase money, they were to pay a monthly rent for her use, and immediately surrender her to her owner.

They were thus quasi, or provisional, owners of the barge, or quasi hirers of her. But in either case their services were rendered to themselves, and for their own benefit, and not to or for the benefit of the legal owner. If an owner of a vessel of which he retains the possession takes service on board of her as mate or seaman, it is plain that he could not assert any lien upon her for his wages; his wages would be due from himself to himself. There would, therefore, be no debt to support the lien, or for which it could serve as security. The same consequence would fol-

low, and for the same reason, if the person rendering the services were the charterer in possession.

It may be objected that these instances furnish no argument, for they merely present this question in dispute under another form. This objection has some plausibility, but these simple illustrations serve to point out what is the true principle to be applied to the case at bar where the circumstances are more complicated. I think it plain, therefore, that before the assignment Kates could have acquired no lien on the vessel. Did the fact that he assigned his interest in the contract to his associate alter his position with regard to the owners, or enable him to acquire, or his associate to create, a lien in his favor on the barge? It appears to me that it did not. His assignment to his partner conveyed his rights, but it did not relieve him of his obligations under the contract. The contract was not by its terms assignable. The company bound itself to sell and give title to Bradbury and Kates on receiving from them the purchase money. It did not agree to sell to their assignee. It may have been content to assume the risk of liens created by them in favor of strangers, but it could not have contemplated the creation by them of liens in their own favor on a vessel of which they were the provisional owners, and were bound, by paying the purchase money to become the absolute owners. And this result could not be brought about either by a joint assignment to a third party nor by assignment by one associate to the other; neither could, without the company's consent, alter his relation to the vessel or to the company. That relation, as established by the contract, remained unaffected by any assignment to which the company did not assent, and which it was under no obligation to recognize for any purpose; and especially when resorted to for the purpose of enabling one of the purchasers to impair, and it might be wholly absorb, the value of the property by creating liens upon her in favor of his associate.

My opinion is that under the circumstances, no lien attached to the vessel in favor of the libellant. Under this view of the case, it will be unnecessary to consider the novel, and, perhaps, embarrassing questions, which arise from the circumstance that the libellant's services were rendered to the barge and the steamer jointly; both vessels being engaged in a common enterprise, in the prosecution of which both were necessarily used, and which were taken possession of by the libellant and his associate under nearly similar contracts, but with different owners. In the contract with the owners of the steamer they appear to have stipulated against the creation of any liens whatever upon her. Disregarding for the moment this latter provision, the inquiry arises: to which vessel did a lien for services rendered to both, attach; or did it attach to both? Could they be libelled jointly, or would each be liable for the whole? And if

not for the whole, how should the proportionate liability of each be determined? Or, if the whole debt was collected from one, could contribution be claimed from the other? And if so, whether for one half of the amount paid, or for a part of it, proportioned to the relative values of the vessels? These and other questions naturally suggest themselves, but it is unnecessary now to attempt to solve them.

The libel must be dismissed.